NEW ENGLAND TELEPHONE & TELEGRAPH CO. v. BUTLER.

(Circuit Court of Appeals, First Circuit. October 18, 1907.)

No. 685.

1. WITNESSES—COMPETENCY—KNOWLEDGE OR MEANS OF KNOWLEDGE OF FACTS.

A clerk in the office of a district foreman of a telephone company is not, from the fact of his position alone, qualified to testify as to the duties of subforemen, who are under the orders of his chief, on an issue as to whether the chief duty of such subforemen was superintendence, so as to render the company liable to other employés for their negligence under the Massachusetts employers' liability act (Rev. Laws, c. 106, §§ 71–79).

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 80–87.]

2. MASTER AND SERVANT—LIABILITY FOR NEGLIGENCE OF SUPERINTENDENT—MASSACHUSETTS STATUTE.

The fact that a foreman having charge of a gang of men works with his hands, the same as the rest of the men, for the greater part of the time, or even all of the time, does not necessarily exclude him from being one "whose * * * principal duty is that of superintendence," within the meaning of the Massachusetts employers' liability act (Rev. Laws, c. 106, §§ 71–79), for whose negligence, causing an injury to another employé, the master is liable.

3. SAME—ACTION FOR INJURY TO SERVANT—QUESTIONS FOR JURY.

Plaintiff was a telephone lineman engaged, with others, under a subforeman, in stringing new wires. He was upon the cross-arm of one pole holding back two wires, while they were being run over the cross-arm of the next pole. To the end of the wires was tied a rope, and beyond that a piece of insulated wire. The foreman and others were beyond the next pole pulling the wires over the cross-arm, when he called to plaintiff to "let them come." Plaintiff did so, and the wires sagged and came in contact with highly charged electric light wires, which ran transversely across the line at a lower level, and he received a shock which caused his injury. There was evidence that the method pursued was not usual nor proper under the circumstances, the plaintiff did not know the position of the light wires, and, because of intervening trees, could not see it distinctly, nor tell whether the insulated wire, the rope, or the bare wires were over the light wires when he was ordered to slack. *Held*, that whether he had such knowledge of the situation that he assumed the risk, or was justified in relying on the care of the foreman and obeying the order, or was negligent in doing so, were questions for the jury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 1068–1132.

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 48 C. C. A. 314.]

In Error to the Circuit Court of the United States for the District of Massachusetts.

Henry W. Dunn (Pitt F. Drew and Powers & Hall, on the brief), for plaintiff in error.

William A. Pew, Jr., for defendant in error.

Before PUTNAM, Circuit Judge, and ALDRICH and DODGE, District Judges.

DODGE, District Judge. The three counts of the declaration upon which the case went to the jury were all based on the Massachusetts employers' liability act (Rev. Laws, c. 106, §§ 71–79). A fourth count

charging liability at common law was stricken out by amendment. Each of the counts under the statute alleged injuries to the defendant in error (hereinafter called the plaintiff) by reason of the negligence of a superintendent in the employ of the plaintiff in error (hereinafter called the defendant). The first count did not specify wherein the alleged negligence of the superintendent consisted, the second count alleged negligence in failing to adopt proper, suitable, and safe methods for doing the work on which the plaintiff was employed, and the third alleged negligence in giving an order to the plaintiff to pay out a certain wire under circumstances rendering it dangerous to him so to do. The answer denied each and every allegation in these counts.

The plaintiff was one of a gang of men, all employés of the defendant, who were engaged in stringing new telephone wires upon certain poles belonging to the defendant, on Rantoul street, in Beverly. Five men in all composed the gang, including McKenzie, a subforeman, and in charge. McKenzie was the alleged superintendent whose negligence was claimed to have caused the plaintiff's injury.

The jury found for the plaintiff, and the case is here on exceptions to rulings made and instructions refused or given by the court at the trial.

The first assignment of error is that a question put on behalf of the defendant to one of its witnesses was excluded.

The witness was one Gwinn, employed by the defendant as clerk in the office of one of its district foremen. The excluded question was: "What are the duties of the subforemen, one of whom, I understand, McKenzie was?" There was no dispute that McKenzie was a subforeman. It appeared that he was one of four subforemen, all under the authority of the district foreman in whose office the witness was employed. The question at issue as to his duties being whether or not his principal duty was superintendence, if all the subforemen performed, or were expected to perform, or had assigned to them, the same duties, evidence tending to show what those duties were might have been admissible. But it did not appear that Gwinn knew what those duties included, and what they did not include. It was not to be presumed, prima facie, that as a clerk in the district foreman's office he had such knowledge. It appeared that he assumed the district foreman's duties when the latter was absent, as often happened, and in that way came in contact with the four subforemen; that among the duties so assumed was the giving of directions to the subforemen when sent to do work of various kinds on the lines within the district—where to go, what pieces of work to do, and what men to take with them. It appeared that he kept the district foreman's books, made a record of the work done, and paid the men. But in all this there was nothing which would naturally require or enable him to know what the duties were which the defendant had assigned to or expected from its subforemen. As to the duties in fact performed by them when at work, it is not contended that he knew, or had any opportunity to know, from actual observation, what these were. He testified that he was present very little when work was being done. The extent to which he claimed to have knowledge regarding the subforemen's duties was stated by him as follows:

"Q. And did you know the course of the business?  A. In what way?"
"Q. In reference to what they did and what their duties were. . A. What kind of work they would be doing?"
"Q. Yes.  A. Yes.

Even if the question were otherwise admissible, we do not think the court was required, in view of what appeared, to treat this statement as qualifying the witness to testify upon the point inquired about and allow the question excluded to be answered.

The next assignment of error is that the court ought to have directed a verdict for the defendant on all the evidence.

We consider first the claim that there was no evidence sufficient to warrant a finding that McKenzie's principal duty was that of superintendence. That superintendence was his sole duty was not contended.

There was no dispute that McKenzie was in charge, as subforeman, of the gang in which the plaintiff was working when injured, and was thus intrusted with and exercising superintendence. McKenzie was himself a witness for the defendant, and testified that during the entire period of his employment as subforeman he worked himself nearly all his time, that he was doing actual manual labor part of his time; how much of the time during the day he could not state. On cross-examination he said that when in charge of a gang engaged on a particular job he had full charge, the choice of methods rested with him, he gave orders to carry out his own ideas, watched the men to see that his ideas were carried out, told them what material to use, and saw that they used it, kept a supervision over them, whatever else he was doing, had in mind, whatever else he was doing, to see that they were obeying his orders, and was supervising all the time. Before he so testified the plaintiff had introduced evidence which, as the defendant concedes, tended to prove that McKenzie "usually spent the greater part of his time directing the men and only a small part of his time in working with his hands." The defendant contends that the different jobs done manifestly varied so much in character that while McKenzie or any other subforeman might be superintending only on one job, on another he might be doing little or nothing but manual labor; and therefore that evidence as to what he usually did does not necessarily show in what kind of work he was spending most of his time, or what his principal duty was on the day of the accident. It contends further that the only evidence relating to this particular day or job was that McKenzie was working with his hands most of the time. That McKenzie did in fact work with his hands on this job is unquestioned. He was pulling on a wire when the plaintiff was hurt. Two of the men in the gang, witnesses for the plaintiff, said, on cross-examination, one that McKenzie worked pulling ropes and doing such things and helping out most of the time that day; the other that McKenzie might on that day have worked with his hands the same as the rest of the men the greater part of the time, and he thought he did so. No other witness was questioned upon this particular point. But if McKenzie, as might well have been found from the evidence, had been given authority of superintendence, and was not a mere laborer in charge of a gang, the fact alone that he did manual work also, even for the greater part of his time, would not necessarily require the con-

clusion that his principal business was not that of superintendence. Working at all times with his hands would not necessarily prevent the exercise of superintendence in such manner that superintendence would be his principal duty. Canney v. Walkeine, 113 Fed. 66, 51 C. C. A. 53, 58 L. R. A. 33. The jury had before them the nature of the work in hand, as well as the evidence above summarized, and were entitled to judge of the extent to which such work involved or required superintendence. We think that the learned judge who presided at the trial was right in declining to hold that there was no sufficient evidence upon which the jury could find McKenzie's principal duty to have been superintendence.

We next consider the claim that the evidence did not warrant a finding that the plaintiff was injured by reason of McKenzie's negligence.

The manner in which the injury was received was not much in dispute. The evidence regarding it may be stated as follows:

Between the two poles belonging to the defendant, from one to the other of which the new telephone wires were being strung (referred to in the evidence as pole No. 3 and pole No. 4), six electric light wires, not belonging to the defendant and carried on a different set of poles, ran transversely to the direction in which, and somewhat below the level at which, the new wires were to be strung. These wires, or some of them, were charged with a dangerous current. They were coated with a weatherproof compound, but were not true insulated wires. The coating would not, in the majority of cases, prevent a current flowing from them to a bare telephone wire in contact with them, if the telephone wire were grounded somewhere. When injured, the plaintiff was up on pole 3, at the lower cross-arm, holding back the new telephone wires, two in number, which were being strung together. One end of them had been passed over the cross-arm where he was toward pole 4. Both were uninsulated or "bare" wires. To that end of them which had been passed over the cross-arm there had just been attached one end of a piece of rope, and to the other end of the rope insulated wire, which had been passed over the electric wires and over the cross-arm on pole 4. McKenzie, beyond pole 4, was pulling on this insulated wire, thereby drawing it, the rope attached to it, and thereby the new "bare" wires fastened to the rope, in a direction from pole 3 across and above the electric light wires, toward pole 4. At some distance from pole 3, in the opposite direction from it, were two other men belonging to the gang, standing on the sidewalk and paying out the new wires; each holding a coil from which one wire ran. Between them and pole 3 was still another telephone pole, referred to as No. 2, about as far from pole 3 as pole 4, but in the opposite direction. The new wires ran from the coils held by the two men along the ground for some distance, then over a cross-arm on pole 2; thence to pole 3 on which the plaintiff was holding them back; thence, as above described, toward pole 4. The electric light wires were nearer to pole 4 than to pole 3. There was evidence that the poles were 130 feet apart, and the electric light wires 28 feet from pole 4 at their nearest point. As to the exact distance of the electric light wires below the level of the cross-arm on pole 4, to which the new wires were being strung, there was some conflict. The plaintiff's evidence made the distance less

than the defendant's evidence. But, whatever it was, danger to the plaintiff was involved, under the circumstances, in contact between the new "bare" wires and the electric light wires below them. If, when the ends of the new wires had been pulled far enough toward pole 4 to be over the electric light wires, they and the rope or insulated wire whereby they were being drawn across should be permitted to sag between poles 3 and 4 enough to lower them to the level of the electric light wires, such contact would occur. There was evidence that this was what happened, that such contact did occur, and that the plaintiff was injured because of it. McKenzie, according to the evidence, while pulling, as above described, upon the insulated wire, called out from beyond pole 4, where he was: "Let them come." The plaintiff eased up on the wires he was holding, still retaining his hold, one or both the new wires touched the electric light wires, fire was seen at the point of contact, the new wires became charged with electricity, which also manifested itself in the coils held by the two men on the sidewalk, one coil becoming red hot, and the plaintiff fell from his position against other telephone wires already fixed to pole 3. According to his testimony, he remembered nothing after he eased up on the wires in obedience to McKenzie's order, until he was being taken down from the pole in his injured condition.

There was evidence from an expert called by the plaintiff that the above method of stringing the wires was not usual and not proper in view of the circumstances. To use covered or insulated wire, instead of bare wire, would have been wisest in his opinion. This would have prevented danger, and it would be proper to run one wire at a time; the foreman standing in the middle of the street and instructing the men on the poles so that they could pull the wire along, keeping it taut all the time. This witness, it is true, said on cross-examination that, with the method used, if the man holding the wires back did the work as he would expect the ordinary intelligent lineman to do it, he thought the probabilities were that he would get the new wire across; but this, it is obvious, was not necessarily an admission that the method adopted was usual, safe, or proper. Covered wire was at hand at the time, and it appeared, without objection, that the wire finally strung between poles 3 and 4 over the electric light wires—the work being completed by McKenzie and the remaining men after the plaintiff's injury—was covered and not bare wire, though McKenzie's evidence tended to ascribe this use of covered wire to purposes other than that of securing the safety of the men engaged.

There was also evidence that McKenzie himself ordered the plaintiff up pole 3 with the new wires and the rope tied to them, himself tied the other end of the rope, after the plaintiff had passed the wires over the cross-arm on pole 3, to the insulated wire, and himself took part in passing the insulated wire over the electric light wires and the cross-arm on pole 4, before he went beyond pole 4, and pulled upon the insulated wire, as above stated.

It appeared, further, that there were, besides the electric light wires, two trolley wires, which also crossed the line of the telephone wires between poles 3 and 4. These ran at a level considerably below that of the electric light wires. They were bare wires and known to be

dangerous. McKenzie told the plaintiff when he sent him up pole 3 to hold the telephone wires back off the trolley wires; but, according to the plaintiff, no warning as to the electric light wires was ever given him, he did not know they were there, and he was never told, and did not know, that the new wires were to be carried over electric light wires at all. The defendant's evidence was, on the contrary, that McKenzie told the plaintiff, when he ordered him up pole 3, with the new wires, to hold them off the electric light wires.

There was evidence that, after the plaintiff reached the position on pole 3 in which he was when injured, the branches of a tree so obstructed his view as to prevent his seeing the electric light wires from there clearly enough to tell on which side of pole 4 they went, or whether the new wires were going above or below them; and that the building against which they had to be seen from where he was had also the effect of preventing him from seeing them with sufficient distinctness for that purpose. Upon this point there was contradictory evidence from the defendant. The trolley wires he could see, and he was looking out for them.

Whether McKenzie was negligent or not as regarded the plaintiff was clearly a question for the jury on the evidence, unless it be true, as the defendant contends, that:

"Whatever conclusion is reached as to the propriety of the method employed, and on whatever grounds the allegations of negligence in the declaration are rested, the risk was obvious to the plaintiff, was one incidental to the business in which he was engaged, and was therefore one which he assumed."

The defendant further relied in support of this contention upon evidence in substance as below.

The plaintiff had had previous experience in working on wires. This had been gained during the 14 months prior to his injury, the time during which he had worked for the defendant. There was some question as to the nature and extent of his experience in such work within that time. He admitted that he knew, generally speaking, the danger involved in letting bare telephone wires touch uninsulated electric light wires; knew also that without going up and examining them he could not tell whether electric light wires were insulated or not; knew that electric light wires were common in city streets; and knew that there were such wires not only in Beverly, but on some part at least of Elliot street, the street in which the wires ran which caused his injury. He was injured soon after dinner on September 30, 1905. In broad daylight he had, of course, the same opportunity of seeing the electric light wires in question, before he went up pole 3, which was open to any one else in the vicinity. Printed "Instructions for the Avoidance of Accidents," warning its employés to inspect for themselves at all times, directing them not to place reliance upon inspections by foremen or fellow workmen, and cautioning them against the danger from all high-tension wires, were displayed, according to the defendant's evidence, in its stock room at Salem. These the plaintiff denied having seen, but he admitted having visited the room referred to "quite a few times." During his experience with such work he had once been warned by another subforeman regarding danger from an electric light wire, and he had once heard the same subforeman give

a similar caution to another man.  With these two exceptions he had never heard the subforeman give such warnings.  There was no other evidence that such warnings were usual or customary.

The general risk of injury from electric light wires was doubtless a risk incidental to the plaintiff's employment, and a risk which he had assumed.  We do not think, however, that the risk to the plaintiff from these wires was, under the particular circumstances shown, a risk which must necessarily have been obvious to him at the time of his injury.

If it could be said that he must necessarily have known that it would depend on him alone whether the bare wires he held should touch electric light wires or not, the risk involved in letting them do so would have been obvious, and he would have taken the chance at his peril of finding the electric light wires dangerously charged.  But that he must have had such knowledge at the time he was ordered to let the new wires come was not the only reasonable conclusion which might have been drawn from the evidence, notwithstanding what appeared as to his experience, or as to his opportunities to know that there were electric light wires somewhere between him and pole 4.  It might still have been found not obvious to him, from his position on the pole, that the new wires were to go over the electric light wires, or were to go so near them, if over them, as to involve danger of contact with them.  He was not being permitted to do the work in his own way, and had nothing to do with the determination of these questions.  They were being settled by McKenzie alone.  Still less was it necessarily obvious to the plaintiff how far toward the dangerous wires the new wires had been drawn at the moment of McKenzie's order.  So long as slackening them would result only in touching the dangerous wires with the insulated wire on which McKenzie was pulling, or with the rope which came next, letting them come involved no danger.  It was not necessarily obvious to the plaintiff that the time had come when, if he slackened them, the bare wires would or might touch the electric light wires.  Nor was the court bound to rule that the probability of danger was obviously such as to make it the plaintiff's duty to investigate, at his peril, before obeying McKenzie's order to let the wires come.  If the danger was not obvious to him, he was entitled to rely on McKenzie's personal supervision as an assurance that the way in which the work was being done was reasonably safe, and could not be said to have assumed any risk which due care in superintendence might have avoided.  Rockport Granite Co. v. Bjornholm, 115 Fed. 947, 53 C. C. A. 429; Mahoney v. Bay State Pink Granite Co., 184 Mass. 287, 68 N. E. 202; Meagher v. Crawford Laundry Machinery Co., 187 Mass. 586, 73 N. E. 853.

The jury might have found that the plaintiff while on pole 3 did not have a fair opportunity to discover for himself what the consequences of compliance with McKenzie's order might be, or to what extent it could be safely complied with.  They might have found that McKenzie, in charge of the whole operation and on the ground below, was or could have been in a position to know and judge accurately regarding these matters.  If the danger might have been fully obvious to McKenzie, but not obvious to the plaintiff, we think it was rightly

left to the jury, under the circumstances shown, in view of the available means of avoiding danger which McKenzie might have used and the opinion of the plaintiff's expert, to say whether a reasonably prudent superintendent would have followed the method adopted by McKenzie, instead of a method safer in some or all the respects suggested. Or, if the method adopted was found to be in other respects proper, it was still for the jury to say whether reasonable prudence in superintendence did not require a caution to the plaintiff at the critical time not to let the wires come too far, instead of ordering him to "let them come," without any caution whatever. Due care in superintendence might have required such a caution, under the particular circumstances, even if it was not the practice, generally speaking, to warn men at work in running wires regarding the presence of other wires which might be dangerous.

It is also evident from what has been stated that contributory negligence on the plaintiff's part in permitting the new wires to touch the electric light wires did not necessarily appear.

The only remaining error assigned is the refusal of an instruction requested on the question of the plaintiff's due care in another respect. The instruction asked was that he was not exercising due care if, at the time of the accident, any part of his person was in contact with any telephone wires other than the new wires which were being strung. We think it would have been obviously improper to bind the jury thus rigidly to a conclusion from one fact which might have been found, without regard to any other circumstances developed in the case and involving questions for the jury.

Whether or not the plaintiff had proved that he was in the exercise of due care was rightly left to the jury on all the evidence under proper instructions.

The judgment of the Circuit Court is affirmed, with interest, and the defendant in error recovers his costs of appeal.